WILLIAM P. STANDISH

*v.*

FREDERICK A. BABCOCK.

On the hearing on a bill for an account the only evidence, as a general rule, material or competent is such as goes to prove or disprove the complainant's right to an account; evidence as to items at that stage of the cause is inadmissible, but where the account consists of but a few items and they are all fully proved by the evidence submitted on the principal question, there the court may decide by the same decree that the complainant is entitled to an account, and also the amount that he is entitled to recover.

On final hearing on bill, answer and proofs taken orally.

Standish v. Babcock.

*Mr. Frank Bergen,* for the complainant.

*Mr. Richards* (of New York), for the defendant.

Van Fleet, V. C.

This is a suit for an account. The transactions which gave rise to the suit were the following: On the 26th day of March, 1884, the complainant, defendant and Joseph W. Moyer exe- cuted an agreement in writing by which Moyer and the com- plainant agreed to use their best endeavors to obtain coal lands at or near Tremont, in Schuylkill county, Pennsylvania, at the lowest price and upon the best possible terms. The defendant agreed to use his best endeavors to make sale of the lands so obtained at the best attainable price, but only upon consultation with the complainant and Moyer. And it was further agreed that all profits made on the sale of the lands obtained should be equally divided among the three. Title to a tract of land lying near Tremont was acquired on the 5th day of April, 1884, though the complainant and Moyer had purchased it about two weeks prior to that date at a public sale made by the commissioners of Schuylkill county. The title to this tract was made to neither of the parties to this suit, but to a son of the defendant. The title was made to the son by the direction of the complainant and Mr. Moyer, notwithstanding the defendant had, in a letter written by him in New York, on the very day the commissioners' sale was made—March 21st, 1884—and sent to the complainant at Potts- ville, Pa., requested that the title be made either to the com- plainant or to Mr. Moyer. In that letter the defendant said :

"If you buy the commissioners' title to-day to the two lots, one. for four hundred and thirty-eight acres and one of one hundred and three acres, have separate deeds, and put either in your name or Mr. Moyer, and then come home that we may raise money on them. And be sure to bring with you the evidence that we have the positive control of the six hundred and seventy-five acres at Panther Head."

The one hundred and three acres mentioned in this letter is the same tract which the complainant and Mr. Moyer purchased at. the commissioners' sale on the 21st day of March, 1884; and

subsequently, on the 5th of April following, procured to be conveyed to the defendant's son. The defendant's son had no beneficial interest in the land. He did not purchase it, nor pay for it, nor pay anything on account of it. He has never pretended that he was the beneficial owner of it. The title was put in his name without his knowledge, and, as it would appear, simply because neither the complainant nor Mr. Moyer was willing to take it. The price paid for the land was $245. The purchase-money was raised in this way: a draft was drawn by the complainant on the defendant for $200, and Mr. Moyer paid the other $45. The defendant paid the draft and also refunded the $45 to Mr. Moyer, so that he paid the whole of the purchase-money. The defendant, in January, 1889, sold the land and made a conveyance of it as the attorney in fact of his son, without consulting the complainant or Mr. Moyer and without their knowledge. He received the whole of the purchase-money and applied it to his own uses. The fair market value of the land at the time of the sale, as the complainant's proofs show, was $90 an acre. The defendant's proofs make it much more, even as high as $400 an acre, but the complainant's proofs are, in my judgment, more trustworthy than those of the defendant. The defendant denies the complainant's right to an account. He says that the land in question formed no part of the subject-matter of the agreement of March 26th, 1884, but was purchased by the complainant, as his agent, for him, at his request, and for his own exclusive benefit prior to the time that that agreement was made.

It is thus seen that the court, in deciding the case, is required to answer but a single question, and that is, were the one hundred and three acres purchased for the defendant alone or for the joint benefit of the complainant, Mr. Moyer and the defendant? The complainant went to Pottsville in the early part of March, 1884. Just before he went, he had an interview with the defendant, in which they discussed the chances of making money by the purchase of coal lands. The complainant knew something about the lands lying in the vicinity of Pottsville, which it was supposed contained deposits of coal. The defend-

ant had no personal knowledge respecting them. The object of the complainant's visit was to inspect such lands, to see whether they could be purchased at prices which would enable the purchaser to resell them at a profit. The defendant requested the complainant to go, and paid his expenses. The complainant swears that it was understood between the defendant and himself, before he went to Pottsville, that all profits which should be made by the purchase and sale of coal lands were to be equally divided among Mr. Moyer, the defendant and himself, and that he so informed Mr. Moyer when he first stated to him the object of his visit to Pottsville. Mr. Moyer is a lawyer, and the special service he was to perform, in the prosecution of the venture, was to examine and pass upon the titles to the lands which might be offered for sale. The claim of the complainant is, that the agreement of March 26th, 1884, merely put in writing what had been previously, before he went to Pottsville, orally agreed upon. The defendant's own letters show that this claim is true.

In his letter of March 21st, 1884, from which a quotation has already been made, he says, referring to a contract of purchase already made or about to be made:

"I want a certified copy of the agreement, or an agreement from Mr. Moyer that, on the payment of $30,000, he will produce the titles to the property. This will be enough to show that *we* have the control of it."

And in a letter written the next day, March 22d, while the complainant was still at Pottsville, he says:

"As soon as the sale is over [meaning the commissioners' sale] you must return here, either with the titles or such evidence of them as will enable *us* to borrow some money."

And in a letter written by him to Mr. Moyer, dated April 25th, 1884, he asked Moyer to change the consideration mentioned in a deed to his son for lands purchased by the complainant and Moyer, either on the same day or the day after the one hundred and three acres were purchased, by raising it from $900 to any sum between $4,500 and $6,000, saying:

Standish v. Babcock.

"I probably could not explain to Mr. Mason [a person with whom he was negotiating a sale of the land] the why and wherefore of *our* obtaining the property at the low price that it comes to *us*."

On the 13th day of January, 1885, the defendant sent to the complainant, by mail, a copy of a contract which he informed the complainant, by a letter enclosed with the copy, that he had signed for the complainant and himself, authorizing a person, by the name of Overton, to make sale of the one hundred and three acres, together with other lands belonging to them. This contract declares that the complainant and defendant are the "owners of deeds and contracts for deeds of certain coal lands known as the Otta tract, the Kidd tract, the Filbert tract and the Panther Head tract, containing together about twenty-five hundred acres, situated in the county of Schuylkill," &c. The one hundred and three acres, in question in this suit, are a part of the Kidd tract, and when the defendant signed this contract, a deed for the other part of that tract had been executed, under a contract of purchase made by the complainant and Mr. Moyer for the benefit of the defendant and themselves, and was then held in escrow. This contract, after stipulating that Overton shall, in case he makes a sale of a one-half interest in the lands for $60,000, or procures a loan of $45,000 on them, have a commission of five per cent., provides that he shall also have "a further commission of an equal one-third interest with us [the complainant and defendant] in the property and franchises that are or may be acquired." The contract, it will be perceived, says, as plainly as words can say, that the complainant and defendant owned the Kidd tract in equal shares. It promises Overton, if he makes sale of a moiety of the lands, or procures a loan on them, that he shall have an equal interest in the lands with the complainant and the defendant. The language is, "an equal one-third interest with us." These words can be construed in but one way.

The defendant made an attempt, by his own oath, to show that he did not understand the contract, when he signed it, as declaring or admitting that the complainant was part owner of the Kidd tract, but his effort in that direction was neither plausi-

ble nor successful.   The following questions and answers show with what art he was tempted to give such evidence, and how reluctantly he gave it:

"*Q.* Why did you let that paper go forward to Mr. Standish, leaving the recital in that form—' F. A. Babcock and W. P. Standish, owners of deeds and contracts for deeds of certain tracts of land '—the Kidd tract being mentioned as one of the tracts ?

"*A.* Because I wanted to sell my own property; I have stated a number of times that an isolated tract of land in that country was worthless."

I pause here to say that what I understand the defendant to mean by this remark is, that it is only large bodies of coal land that can be sold to the best advantage, and that small tracts are comparatively of little value.   This being so, it is manifest that if the one hundred and three acres had been originally purchased for the defendant alone, he would almost necessarily, after larger tracts, lying adjacent to the one hundred and three acres, had been purchased for the joint benefit of the three, asked that his one hundred and three acres should be considered joint property, in order that it, as well as the larger tracts, might be sold to the very best advantage.

The defendant was then asked:

. " What was your understanding, when you forwarded that paper, of that language that I have called your attention to ?   What did you think it meant?

"*A.* My object was to try and sell the land.

"*Q.* Not your object, but what you thought it meant?

"*A.* I thought it meant a sale.

"*Q.* Well, it is your own case; if you let it go in in that way I don't care anything about it.   What was your understanding, when you forwarded that paper, of that language that I have called your attention to ?   What did you think it meant—not the whole paper, but the particular words that I have read to you—Standish and Babcock, owners of Kidd, Reese, &c. ?   Now, what interpretation did you put upon that language, ' owners?'

"*A.* Why, that I owned certain property, and that he owned or controlled certain other property.

"*Q.* And between you, you owned the whole, is that what you meant ?

"*A.* Yes, sir."

But the complainant owned no property in severalty.   The fact is, and it is a thing about which there is no dispute what-

ever, that the complainant neither owned nor controlled a single foot of land in Pennsylvania in which the defendant and Mr. Moyer did not have prescisely the same interest that he had. All the evidence in the case, except that given by the defendant himself, goes to show that the one hundred and three acres were purchased under an oral contract for the joint benefit of the complainant, defendant and Mr. Moyer. That contract was subsequently put in writing, and signed on the 26th day of March, 1884. The land in question, according to the understanding of the parties, constituted, unquestionably, a part of the subject-matter of that contract.

The complainant is entitled to a decree with costs. He claims that the quantity of land in the tract, which is the subject of this suit, is greater than one hundred and three acres. From the evidence now before the court, there is reason to believe that this claim is true. Unless the parties agree as to the quantity, further evidence may be offered on that point. All other facts necessary to be used in stating an account are, I believe, already in proof. A reference to a master is, therefore, unnecessary. On the original hearing on a bill for account, the only evidence, as a general rule, material or competent, is such as goes to prove or disprove the complainant's right to an account. Evidence respecting the items of the account is, in strictness, at that stage of the cause, inadmissible (*Hudson* v. *Trenton Locomotive Works, 1 C. E. Gr. 475*), but where the account consists of but a few items, and they are all fully and satisfactorily proved by the evidence submitted on the principal question, there is no reason, of either justice or correct practice, why the court should not in such a case decide, by the same decree, that the complainant is entitled to an account and also the amount that he is entitled to recover.